**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-104-RJL** |
| **KLETE KELLER** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Klete Derik Keller once wore the American flag as an Olympian. On January 6, 2021, he threw that flag in a trash can.

After the 2020 presidential election, Keller interfered with the peaceful transfer of power. For the first time in over 200 years, he and others broke that sacred tradition by breaching the United States Capitol in a violent riot. He remained inside for almost an hour and stopped just short of the Senate Chamber, chanting "Fuck Nancy Pelosi!" and "Fuck Chuck Schumer!" At 6'6" and over 250 pounds, he repeatedly resisted officers' attempts to remove him from the building, at one point jerking his elbow away. Only when riot officers deployed chemical irritants and force did he retreat and exit the building. Knowing he was fleeing a crime scene, he threw his "U.S.A." jacket in the trash and later destroyed his phone.

On the train back to his hotel, a father and son joined his car and sat near him. The son saw Keller and asked for a photograph with the former gold medalist. While Keller posed, he broke down inside. Years earlier, he had stood on the world's brightest stage as a representative of the United States. Now, just an hour ago, he stood in the middle of the Capitol and sang the national anthem—this time with alarms and pepper spray in the air, injured officers and rioters on the ground, and an election on the brink. While this realization should have struck amidst the chaos in

1

the Capitol, Keller's regret surfaced quickly.

Within a week, Keller self-surrendered after his arrest warrant was issued. By summer 2021, he met and proffered with the government, detailing what he had done. By September 2021, he was one of the first people to plead guilty to felony obstruction under 18 U.S.C. § 1512(c)(2), and he was one of the first people to publicly agree to a cooperation plea agreement. For nearly three years, Keller has cooperated with the government's investigation into the attack on the Capitol—repeatedly meeting with the government to describe everyone around him and everything that happened leading up to and on January 6. He has provided substantial assistance and has expressed remorse for his crimes.

What Klete Keller and others did on January 6 was unconscionable. It will forever be a stain on this country's narrative, and it continues to impact our ability to credibly lead by example as a democratic republic. A former Olympian with an opportunity to see up close America's ideals and represent its position in the world, Keller was in a unique position to know better. He should be punished, and his punishment should include imprisonment. But he has also shown genuine remorse and, more importantly, he has tried to right his wrong for nearly three years. The agreed-upon advisory Sentencing Guidelines Range in this case is 21-27 months' imprisonment. The government requests that this Court depart downward and sentence Klete Derik Keller to 10 months of imprisonment (approximately fifty percent below the bottom end of the advisory Sentencing Guidelines Range), 36 months of supervised release, $2,000 in restitution, and the mandatory assessment of $100.

## I.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted because the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex.

That day, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had

become a civil disorder, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to protect Vice President Pence.

At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars.[1]

Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

Keller joined this attack on the United States Capitol along with hundreds of other rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and

gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov /imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021- 05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott,

Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol.

### C.      Klete Keller's Role in the January 6, 2021 Attack on the Capitol

#### *Breaching the Capitol*

Klete Keller, a former U.S. Olympic swimmer, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol. As seen throughout the videos and photographs, Keller joined the riot and breached the Capitol while wearing a blue jacket with the American flag on the sleeve, an Olympic patch on the front, and "U.S.A." in large white letters on one sleeve and across the back. At times while inside the Capitol, Keller put a dark-colored beanie with "Trump" on his head, pulled a light blue bandana over his mouth, and put on sunglasses—all to help conceal his identity and to shield his face and eyes from law enforcement's chemical-irritant spray. The pictures below, Images 1 and 2, depict Keller and his attire while inside the Capitol on January 6, 2021, as seen on open-source video.



*Image 1: Screenshot of Exhibit 1 at 14:41*



*Image 2, Patch on the Front Left of Keller's Jacket*

Keller traveled to Washington, D.C. from his home in Colorado on January 5. On January 6, he first attended the "Stop the Steal" rally at the Ellipse where he listened to former President Trump and others address the crowd. Eventually, Keller marched to the Capitol with thousands of others.

At approximately 2:30 p.m., Keller breached the restricted Capitol grounds on the west side of the Capitol. Passing through throngs of other rioters, law enforcement officers, and signage ordering him not to enter, Keller went forward. He climbed the stairs to the Capitol's upper west side, passing by damaged scaffolding intended for the presidential Inauguration planned for two

weeks later, where the peaceful transfer of power was to occur. By 2:39 p.m., as seen on Capitol CCTV footage captured in Image 3 below, Keller breached the Capitol through the open Upper West Terrace Door on the west side of the building leading to the Rotunda—his phone up and appearance concealed by a beanie, sunglasses, and a bandana pulled over his face.



*Image 3: Screenshot of Capitol CCTV over Upper West Terrace Door at 2:39 p.m.*

Keller would remain in the building and participate in the riot for nearly an hour. Throughout his time in the Capitol, Keller photographed and recorded his surroundings, as if the riot was a moment in American history he wanted to remember. As detailed below, the government would never recover those photographs and videos, because Keller destroyed his phone with a hammer soon after January 6.

### *Marching Down the Senate Hallway*

By 2:41 p.m., Keller and a large group of rioters were marching down the Senate Hallway connecting the Rotunda to the Senate Chamber where legislators were constitutionally and statutorily supposed to be engaged in the transfer of presidential power. Instead, they were

9

evacuating because of rioters like Keller. Eventually, Keller and others significantly outnumbered the officers—the last bulwark between the riot and the Senate Chamber, a mere fifty feet behind them. The mob began chanting at the officers, "You serve us!" The rioters toward the front began pressing up against the officers who locked arms and grabbed each other's shoulders to brace against the impact.

Keller, at 6'6", saw this unfolding and chose to join the mob rather than leave. As seen in open-source video, Keller moved forward and began leading chants of "Fuck Nancy Pelosi!" and "Fuck Chuck Schumer!" *See* Exhibit 2.



*Image 4: Screenshot of Exhibit 2 at 0:01*

Keller led his chants against the officers and the electoral process with hundreds of rioters behind him, filling in the Senate Hallway. But, as seen in Image 5 below showing Keller from behind, only a few rioters stood between Keller and the officers. Behind those officers was the

door to the Senate Chamber.



*Image 5: Screenshot of Exhibit 3*

Nearly immediately after Keller's chants, the rioters began to push forward against the officers. Other rioters began chanting, "Our house!", "Fuck McConnell!", and "Push!" while advancing. Some rioters at the front physically engaged with the officers and used a stolen riot shield to push forward while others clad in military-grade tactical gear heaved forward and shouted, "Push! Push! Push! Get in there!" After minutes of using their collective weight to move forward, open-source video shows the rioters prevailed, successfully pushing the line of officers back toward the Senate Chamber. *See* Exhibit 4.

Multiple officers in that line have testified in other trials. In their testimony, they have described the tremendous fight it took to keep the rioters back, and the fear and pain they felt while waging that battle inside the United State Capitol. Metropolitan Police Department ("MPD")

Officer Christopher Owens has testified, "When the lines collided . . . the surge of us against the surge of the rioters coming at us lifted me up off my feet. . . . I was just literally lifted up off the ground." Transcript 1, *United States v. Rhodes, et al.*, Case No. 22-cr-15, 10/26/22AM Tr. at 5441. He continued, "My arms and legs were bruised and bloodied and battered." *Id*. at 5453. MPD Officer Anthony Jackson who fought the rioters back with Officer Owens has previously testified that, "the biggest thing was like the weight of all of them, like just pushing down on you. . . . And for a moment, I thought we were going to lose this fight." Transcript 2, *United States v. Minuta, et al.*, Case No. 22-cr-15, 1/6/23AM Tr. at 3384.

This particular moment in the attack on the Capitol—one that Keller helped motivate from the front lines—left an imprint on these and so many other officers that have lasted to today. As Officer Owens explained in a victim impact statement in another case: "[H]undreds of my fellow officers experienced traumas. We experienced physical traumas, emotional traumas and mental traumas." He explained that his "physical traumas, bruises and scars have healed but the emotional and mental traumas from that day stay with me to this day." Transcript 3, *United States v. Rhodes, et al.*, Case No. 22-cr-15, 5/24/23 Tr. at 8-14.

### *Resisting Officers in the Rotunda*

When the rioters began gaining ground toward the Senate Chamber, the officers deployed chemical-irritant spray over the mob. Many of them, including Keller, retreated to the Rotunda. Keller, however, still did not leave the building.

By 2:51 p.m., Keller was recording his surroundings throughout the Rotunda and interacting with other rioters unlawfully in the Capitol and continued doing so for over ten minutes. At approximately 3:02 p.m., law enforcement officers entered the Rotunda, attempting to regain control of the area and clear rioters out of the building. Keller refused to leave. As officers began

pushing some of the rioters toward the east exit, Keller approached the officers in the center of the Rotunda and resisted the officers' efforts to clear the building by repeatedly moving to the front of the line and leaning backwards into the line of officers with his 6'6", 250+ pound frame. As seen in a screenshot of Exhibit 1, Keller towers over the officers. It took multiple officers to move just Keller through the Rotunda and toward a door he could have exited voluntarily before the crowd became too tightly packed.



*Image 6: Screenshot of Exhibit 1 at 14:38.*

Despite multiple officers pushing Keller toward the exit, he still did not leave. Instead, he separated himself from the officers and took his phone out again to record the events unfolding around him: standing in the center of the Capitol building, Keller joined a chorus of rioters singing the song Keller had represented many times on a different stage, the national anthem. *See* Exhibit 5, MPD Body-Worn Camera footage, from 22:45 through 23:30.

Eventually, officers deployed another wave to clear the Rotunda. Again they pushed Keller

toward an exit, and again he refused to leave. Ripping his elbow away and shaking one of the officers off of him, Keller turned to face the officers and repeatedly yelled at them to "Take it easy!" and "Settle down!" He defiantly yelled, "Why do we have to leave?" despite the violence around him and the significant disruption he was causing. *See* Exhibit 6, MPD Body-Worn Camera footage, from 24:00 through 25:10.



*Image 7: Screenshot of Exhibit 6 at 24:15, Showing Officers Removing Keller*

Keller's imposing physical presence and active refusal to leave contributed to the enormous pressure of bodies pressing against the officers that were trying to clear the building. Officer Jackson, who moved into the Rotunda after clearing Keller and others out of the Senate Hallway, has previously testified that he was terrified by the crushing weight and aggression of the rioters in the Rotunda around the time Keller was inside. "At this point, my daughter was maybe 10 months," he explained, "[a]nd I had never been a part of anything like this in my life. So it kind of took me a moment to realize, like, you may not make it out of here today." *United States v. Minuta,*

*et al.*, Case No. 22-cr-15, 1/6/22AM Tr. at 3386. "If they were successful in pulling us into the crowd, we don't know what would have happened, honestly." *Id.* As other rioters like Keller resisted the officers, Officer Jackson's partner struggled, saying, "I can't breathe." *Id.* at 3402.

Yet Keller still did not leave. As if it was the *officers*, not the rioters, who were out of line, Keller positioned himself at the front of the remaining rioters and began filming the officers. *See* Exhibit 6, MPD Body-Worn Camera footage, from 24:00 through 25:10.



*Image 8: Screenshot of Exhibit 6 at 24:53.*

### Remaining in the East Rotunda Lobby

Finally, at approximately 3:13 p.m., after multiple interactions with officers, Keller exited the Rotunda and entered the East Rotunda Lobby. Hundreds of rioters filled the lobby, many of whom were verbally and physically accosting the officers trying to clear the area. Whatever space was not filled with rioters was filled with blaring alarms and noxious pepper spray warning everyone to exit. Keller remained inside for another 17 minutes. He clapped for and cheered on other rioters. As captured in open-source video, one rioter pushed against officers trying to remove

him from the Rotunda like they removed Keller, and on the way out the rioter chanted about government actors being "whores of the tyranny." *See* Exhibit 7. Seeing over the other rioters in the lobby, Keller witnessed this rioter's actions and asked for and took a selfie photograph with the rioter, telling him, "you're the man, dude!" *See* Exhibit 7 and Image 9, a screenshot from Capitol CCTV footage.



*Image 9: Screenshot of Capitol CCTV over East Rotunda Lobby at 3:20 p.m.*

It eventually took law enforcement deploying a significant number of officers and physical, non-lethal force to clear Keller and the other rioters out of the lobby. Open-source video recorded next to Keller's perspective makes clear the sheer force the officers had to use to finally remove Keller and others—with officers embracing one another in a rugby scrum, pepper-ball guns aimed and firing, and rioters still resisting. *See* Exhibit 8. Keller appears at the end of the video at 0:39.



*Screenshot of Exhibit 8 at 0:11, Showing Keller's Perspective Before Exiting*

Capitol Police Officer Marc Carrion was one of the officers in that scrum. He worked to clear the East Rotunda Lobby throughout the entire afternoon on January 6. He has previously testified in other trials about the threat each rioter presented to everyone in the Capitol and the physical challenge of trying to clear the building and seal the doors shut. "So all these people to me are threats because . . . every one of them has entered the Capitol building without being screened. We have no idea what weapons, if they have any, are on them, nor do I know their intent of what they might or possibly could do." Transcript 4, *United States v. Parker, et al.*, Case No. 21-cr-28, 2/10/23AM Tr. at 1407. "My duty is to protect the building," he explained, "[a]nd I felt like that day, like, you know, there's the possibility that we were going to die that day." *Id*. at 1378.

At around 3:30 p.m., officers finally succeeded in ejecting Keller from the Capitol. Later, after finally removing Keller and hundreds of other rioters from the Capitol through the East Rotunda Lobby, Officer Carrion and others sealed the doors. "Later on, we had enough

reinforcements, other law enforcement, that were able to, basically, create a group, push through a number of people that were on the other side to give us enough space and clearance." *Id*. at 1410. "We had to grab the iron benches, the stanchions, anything we could find to throw in that space in between the doors to prevent those doors from collapsing in. And all the benches pressed up against it forced the doors out, and anybody on the outside of that, they could not enter; they could not push through it." *Id*. at 1411-12. That officer, who fought to remove Keller and so many others from the Capitol that day, went home late and scrubbed pepper spray out of his uniform until 4:00 a.m. to return to work the next morning at 7:00 a.m. *Id*.

### Trashing His U.S.A. Jacket and Phone

While Officer Carrion was washing his uniform, Keller was throwing his clothing in the garbage. Leaving the Capitol, Keller was already aware of the criminal nature of his actions. As a high-profile person, he knew that he would need to destroy evidence of his identity for the best chance of concealing his actions inside the Capitol. So he threw his U.S.A. Olympic jacket in the trash can on the way back to his hotel. The government was never able to recover that jacket. He also knew he had traveled with and used his phone, recording his actions throughout the Capitol. So he took a hammer and smashed the phone into pieces soon after January 6. Despite multiple search warrants and other legal process, the government never recovered any of Keller's photographs or videos he recorded in or around the Capitol.

Keller then flew back home to Colorado. His arrest warrant went public, and he self-surrendered a week later on January 14, 2021.

## II.     THE CHARGES AND PLEA AGREEMENT

On February 10, 2021, a federal grand jury returned an indictment charging Klete Deirk Keller with seven counts, including: civil disorder, in violation of 18 U.S.C. § 231 (Count One);

obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Three); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Four); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); impeding passage through the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(E) (Count Six); parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). On, September 29, 2021, Keller entered a plea agreement and pled guilty to Count Two, felony obstruction of an official proceeding.

## III.   STATUTORY PENALTIES

Keller now faces sentencing on felony obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties agree, and the PSR correctly calculates Keller's advisory Sentencing Guidelines range as follows:

19

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| | | |
|---|---|---:|
| U.S.S.G. § 2J1.2(a): | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2): | Substantial Interference with Administration of Justice[2] | +3 |
| U.S.S.G. § 3C1.1: | Obstructing the Administration of Justice | +2 |
| **Total:** | | **19** |

| | |
|---|---:|
| **Combined Offense Level** | **19** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |

| | |
|---|---:|
| **Total Adjusted Offense Level:** | **16** |

*See* Plea Agreement at ¶4.

*Obstruction Enhancement (U.S.S.G. § 3C1.1).* The parties agree that, pursuant to U.S.S.G. § 3C1.1, a two-level increase in Keller's offense level is warranted based on his initial obstruction of the investigation of this case. Keller was arrested eight days after January 6. He knew that he wore a distinctive jacket inside the Capitol, and he knew that he had traveled with and used his mobile phone throughout the day on January 6. And, at the time, there was a significant amount of publicity about Keller, given his distinctive height and size, potentially being in the Capitol during the riot. Aware of these circumstances, Keller threw his jacket in the trash and destroyed his phone. The government was never able to recover the jacket or the phone and the photographs and videos Keller recorded inside the Capitol. By discarding his jacket and destroying his phone, Keller was "willfully obstruct[ing] or imped[ing], or attempt[ing] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Keller admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

offense of conviction," and "the obstructive conduct related to [Keller's] offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Therefore, a two-level increase is warranted under U.S.S.G. § 3C1.1.

*Acceptance of Responsibility (U.S.S.G. § 3E1.1)*. Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"— which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and all harm caused by those acts or omissions or was the object of those acts or omissions. U.S.S.G. §§ 1B1.3(a)(1)(A), 3E1.1 cmt. n.1(A). Proffering repeatedly, agreeing to cooperate with the government's investigation, pleading guilty before trial, and not falsely denying any additional relevant conduct "constitute[s] significant evidence of acceptance of responsibility for the purposes of subsection (a)." U.S.S.G. § 3E1.1 cmt. n.3.

Notably, conduct resulting in an obstruction of justice adjustment can co-exist with acceptance of responsibility "in extraordinary cases." U.S.S.G. § 3E1.1 cmt n.4. Here, the government's position is that this is an extraordinary case where both obstruction and acceptance of responsibility adjustments should apply. The timeline supports such a finding. "In evaluating whether [a defendant's] case was an 'extraordinary' one, [the court] must look at the relationship between his obstructive conduct and his acceptance of responsibility." *United States v. Gregory*,

315 F.3d 637, 640 (6th Cir. 2003). Where the obstructive conduct pre-dated the acceptance of responsibility, the acceptance adjustment may apply. *See id.* ("All of his obstructive conduct predated the indictment and the guilty plea. He has fully cooperated subsequently."); *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) ("Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice."). Here, the obstructive conduct all predates Keller's agreement to plead guilty, to cooperate, and to proffer with the government repeatedly from Summer 2021 on. More significantly, Keller admitted to the conduct that provides the basis for the obstruction of justice enhancement when debriefing with the government.

*Zero-Point Offender Reduction (U.S.S.G. § 4C1.1).* Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

The Court should not apply § 4C1.1. During the course of resisting police efforts to remove him from the Capitol, Keller ripped his elbow away and shook one of the officers off of him. Especially in the context of this violent riot, Keller's actions constituted violence and/or a credible threat of violence, and so the provision does not apply on its face. *See* U.S.S.G. § 4C1.1(3).

Further, the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they

22

personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the

government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

*Criminal History Category*. The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 16, Keller's Guidelines imprisonment range is 21 to 27 months of imprisonment. The defendant's plea agreement contains an agreed-upon advisory Sentencing Guidelines Range calculation that mirrors the calculation contained herein.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration, but one that is lower than the advisory Guidelines Range.

### A.    Nature and Circumstances of the Offense

Keller's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Keller joined a violent riot and breached the United States Capitol building, coming within fifty feet of the Senate Chamber. He marched around inside to obstruct the electoral process for nearly an hour and repeatedly refused to leave despite law enforcement physically trying to remove him, all because his preferred candidate lost an election. He put the officers, Members of Congress, their staff, and everyone else inside in danger. And he destroyed his clothes and phone afterward to conceal his identity and actions. The nature and circumstances of Keller's offense fully support the government's recommended sentence of 10 months' imprisonment.

24

**B.** **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

Keller's criminal conduct on January 6 was the epitome of disrespect for the law. He played a role in an unprecedented effort to oppose the transfer of presidential power. For over two-hundred years, since President George Washington first voluntarily relinquished his executive power back to the people and set in motion a tradition that has formed the bedrock of our democracy, the American people have chosen their president through free and fair elections. Not force. Not riot. Not mob rule. As one court in this district has cautioned, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

Moreover, attacking the Capitol building and grounds constitutes an attack on the rule of law. Keller and his fellow rioters attempted to silence millions of Americans who had placed their vote for a different candidate, to ignore the variety of legal and judicial mechanisms that lawfully scrutinized the electoral process leading up to and on January 6, and to shatter the democratic system of governance enshrined in our laws and in our Constitution. And when he and others did not get what they wanted, they acted by together attacking the very people and place at the very time when those laws were in action. At its essence, Keller's crimes are the antithesis of respect for the law.

As with the nature and circumstances of the offense, this factor supports a sentence of imprisonment.

C.     The Need for the Sentence to Afford Adequate General Deterrence

A serious sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of a sentence of imprisonment, as they will for nearly every case arising out of the violent riot at the Capitol.

As noted by Judge Moss during a different sentencing hearing,

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Hodgkins*, No. 21-cr-188, Sent. Tr. at. 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was [before January 6] for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

As this Court is well aware, the justice system's reaction to January 6 bears the weighty responsibility of impacting whether January 6 becomes an outlier or a watershed moment. "By nearly every measure, political violence is seen as more acceptable today than it was five years ago." Adrienne LaFrance, *The New Anarchy: America faces a type of extremist violence it does not know how to stop*, THE ATLANTIC, Mar. 6, 2023 (citing a 2022 UC Davis poll[4] that found one

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[4] *See* health.ucdavis.edu/vprp/pdf/Political-Violence-Fact-Sheet%201_7-21-22.pdf

in five Americans believes political violence would be "at least sometimes" justified, and one in 10 believes it would be justified if it meant the return of President Trump). Left unchecked, this impulse threatens our democracy.

### D.      Keller's History and Characteristics, Cooperation, and Remorse

The Olympic motto is *Citius, Altius, Fortius – Communiter*. Faster, Higher, Stronger – *Together*.[5] Nothing Keller and others did on January 6 lived up to the spirit of "together." Indeed, what he did was the complete opposite—the riot on January 6 helped tear this country apart, communities apart, families apart, and even individual people apart as they confront what they did. The clashes across rioters, law enforcement, Members of Congress, and the public over that day continue to ripple through time.

Within a week, however, Keller began the process of fixing what he helped break. He self-surrendered to law enforcement on January 14 after his arrest warrant became public. Just a few months later, he met with the government and proffered what he had done—including actions the government had not yet learned and might not have learned, such as his efforts to destroy evidence and throw away his jacket. By September 2021, just eight months after January 6, Keller pled guilty to felony obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2)—publicly acknowledging and accepting responsibility for his role in obstructing the peaceful transfer of power. Not only did Keller plead guilty, but he publicly agreed to cooperate with the government's investigation, one of a small number of individuals that were the first group to do so that summer.

Keller's early, public cooperation mattered. Because of his high public profile, his

---

[5] *See* olympics.com/ioc/olympic-motto.

cooperation generated a large amount of publicity.[6] Given the unique circumstances around January 6, including the unprecedented number of individuals responsible and under investigation at the time Keller pled guilty, Keller's early public cooperation plea undoubtedly reached thousands of others weighing whether to turn themselves in, plead guilty, or even cooperate. Keller's public acknowledgement that his interference with the peaceful transfer of power was, in fact, a serious crime provided an important counterweight to the false narrative that January 6 was a peaceful, lawful protest. And many others have followed.

Keller proffered multiple times with the government on his case alone. Not only did he discuss his actions the government knew about through video evidence, but he admitted to actions the government did not know about that increased his sentencing exposure. For example, the government was never able to recover Keller's phone he used inside the Capitol in any search warrant or at the time of arrest. It is through Keller's proffer alone that the government knows he took a hammer to the phone soon after exiting the Capitol. Likewise, the government only learned from Keller that he had ditched his "U.S.A." jacket soon after exiting the Capitol building. To Keller, it was important that the government knew everything he did, not just what he had done inside the building.

---

[6] *See, e.g.*, *The Washington Post* (washingtonpost.com/sports/olympics/2021/09/29/klete-keller-swimmer-jan-6-riots-guilty/); *The New York Times* (nytimes.com/2021/09/29/sports/olympics/klete-keller-pleads-guilty-capitol-riot.html); *The Los Angeles Times* (latimes.com/sports/story/2021-09-29/olympic-swimmer-klete-keller-pleads-to-capitol-riot-charge); *CBS News* (cbsnews.com/losangeles/news/former-usc-olympic-swimmer-klete-keller-pleads-guilty-for-role-in-jan-6-insurrection/); *ABC News* (abcnews.go.com/US/olympic-gold-medalist-klete-keller-pleads-guilty-felony/story?id=80324959); *NBC News* (nbcnews.com/news/us-news/klete-keller-olympics-swimming-star-pleads-guilty-capitol-riot-case-n1280375); *ESPN* (espn.com/olympics/story/_/id/32308155/former-olympic-swimmer-klete-keller-pleads-guilty-storming-us-capitol);*Swimming World Magazine* (swimmingworldmagazine.com/news/klete-keller-cooperating-with-authorities-could-testify-in-jan-6-trials/).

Keller also agreed to enter a cooperation plea agreement that continues to be unique in kind. He is not a traditional defendant with co-conspirators and co-defendants that he can provide information about. But he did engage in a riot with hundreds of others around him that were causing violence, interfering with law enforcement, and damaging property. So he agreed to proffer with the government and testify about anyone that did anything around him during his nearly one hour inside the Capitol. And he did so publicly—a warning to anyone around him at any time that the government's investigation was strong and strengthening.

Beyond the message Keller's public cooperation agreement sent, he in fact substantively cooperated as expected. He traveled multiple times to meet with government to fully explore and discuss his actions and intent around the time of January 6 and the actions and perceived intent of many others around him. While he did not testify at any trial, he aided various trial teams' investigations and remained available for them to call to the stand.

Keller has been cooperative and remorseful for nearly three years since the time of his self-surrender on January 14, 2021. In his telling, Keller knew he had participated in a dark moment in American history when, on the train ride away from the Capitol, a kid asked to take a photograph with an Olympian. Certainly he should have realized the wrongfulness of his conduct amidst the chaos in the Capitol, but Keller's regret surfaced quickly. Of course, remorse is only a small part of any sentencing analysis; but, given the continuing echoes of misinformation in the public sphere about January 6 and the concerning number of defendants who have expressed little to no remorse or, worse, have promoted themselves and disinformation about January 6, Keller's remorse matters. Such acceptance reflects a lack of need for specific deterrence and will hopefully promote genuine reflection and remorse in others.

Notably, Keller never wavered in his acceptance of responsibility or cooperation despite

29

experiencing many life and legal hurdles throughout the last three years. After January 6 and after his public cooperation plea agreement, he received threats and concerning messages and posts online about him. Yet, he has always met when the government requested a meeting. Further, his prior counsel who shepherded him through this process tragically passed away from health problems this past year. Again, Keller worked with new counsel, stuck to his plea agreement, and continued to cooperate. Today, it is the government's understanding that Keller continues to stand ready to answer any other questions from the government even after his sentence is imposed.

Finally, Keller has remained on release with many conditions since his self-surrender just one week after January 6. And he has repeatedly agreed to continue his sentencing and remain on these conditions throughout the last three years to continue cooperating with the government's investigation before receiving any sentence and finality to his case.

In sum, Keller's conduct on January 6 was grave and warrants serious punishment. His cooperative conduct after, however, is also relevant. This combination of aggravating and mitigating factors is unlike most January 6 defendants, and it warrants its own analysis separate and apart from any cases that precede it. A 10-month sentence of imprisonment is warranted—a sentence of incarceration that promotes general deterrence and respect for the law, but a period of time (approximately fifty percent below the bottom end of the advisory Sentencing Guidelines Range) that recognizes his early efforts to acknowledge responsibility, aid the government's investigation and, in fact, live up to the Olympic creed moving forward.

## F.     RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. As detailed above, the latest calculations reflect that the riot at the United States Capitol caused over $2.9 million in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Keller must pay $2,000 in restitution, which reflects in part the role Keller played in the riot on January 6. Plea Agreement at ¶ 12. This amount fairly reflects Keller's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity. Keller's restitution payment must be made to the Clerk of the Court, who

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VI.    CONCLUSION

The government recommends that the Court depart downward from the advisory Sentencing Guidelines Range of 21-27 months' imprisonment and impose a sentence of 10 months of incarceration, 36 months of supervised release, $2,000 in restitution, and the mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _____
Troy A. Edwards, Jr.
Assistant United States Attorney
N.Y. Bar No. 5453741
U.S. Attorney's Office, District of Columbia
601 D Street, N.W.
Washington, D.C. 20530

32

## INDEX OF SENTENCING IMAGES, EXHIBITS, AND TRANSCRIPTS[8]

- **Images**
  - Image 1: Keller in Rotunda
  - Image 2: Olympic Patch
  - Image 3: Keller Entering Capitol
  - Image 4: Keller in Senate Hallway
  - Image 5: Keller in Senate Hallway 2
  - Image 6: Keller in Rotunda 2
  - Image 7: Keller in Rotunda 3 (BWC)
  - Image 8: Keller in Rotunda 4 (BWC)
  - Image 9: Keller in East Rotunda Lobby

- **Videos**
  - Exhibit 1: Keller in Rotunda
  - Exhibit 2: Keller in Senate Hallway
  - Exhibit 3: Keller in Senate Hallway 2
  - Exhibit 4: Senate Hallway Push
  - Exhibit 5: Keller in Rotunda 2 (BWC)
  - Exhibit 6: Keller in Rotunda 3 (BWC)
  - Exhibit 7: Keller in East Rotunda Lobby
  - Exhibit 8: Keller in East Rotunda Lobby 2

- **Transcripts**
  - Transcript 1: *United States v. Rhodes et al* - Case No 22-cr-15 - 102622AM - MPD Ofc Owens Testimony Transcript
  - Transcript 2: *United States v. Minuta et al* - Case No 22-cr-15 - 010623AM - MPD Ofc Jackson Testimony Transcript
  - Transcript 3: *United States v. Rhodes et al* - Case No 22-cr-15 - 052423 - Sentencing Transcript
  - Transcript 4: *United States v. Parker et al* - Case No 21-cr-28 - 021023AM - USCP Ofc Carrion Testimony Transcript

---

[8] The government has provided these images, exhibits, and transcripts to the Court and counsel via USAfx.