**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:21-cr-00104-RJL |
| v. | Hon. Richard J. Leon |
| KLETE DERIK KELLER,<br>*Defendant*. | Sentencing: December 1, 2023, at 4:00 PM |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS**
**POSITION WITH RESPECT TO SENTENCING**

Klete D. Keller, by counsel, respectfully submits this Memorandum in Support of his Position on Sentencing. For the reasons stated herein, Mr. Keller requests a probationary sentence accompanied by a reasonable restitution order. Such a sentence is consistent with the requirements outlined in 18 U.S.C. § 3553(a) and is consistent—given the unique facts of Mr. Keller's case—with other January 6 defendants who have been convicted of stand-alone violations of 18 U.S.C. 1512(c)(2).

**DISCUSSION**

Mr. Keller recognizes the gravity of his involvement in the events at the Capitol on January 6, the injury caused to the democratic process, and the responsibility he bears for his role in the events of that day. To that end, *over two years ago*, on September 29, 2021, Mr. Keller pled guilty to Count Two of the Indictment, charging him with felony Obstruction of Congress in violation of 18 U.S.C. § 1512(c)(2). The issue presented here for the Court to decide in sentencing Mr. Keller is what sentence is sufficient but not greater than necessary to meet the statutory goals of sentencing. Accordingly, given (1) Mr. Keller's early acceptance of responsibility, (2) his relatively short-lived presence inside the Capitol during which he did not assault anyone or commit any other act of violence against either person or property, (3) his lack

of criminal history, (4) a successful record of *nearly three years* of pre-trial supervision—during which time Mr. Keller has been a flawless probationer[1], (5) his personal history and circumstances, and (6) his continued cooperation with the government over many months; a probationary sentence and accompanying restitution order is sufficient but not greater than necessary to meet the goals of sentencing and is in line with others who have been sentenced for similar conduct.

## I.      Mr. Keller's Actions on January 6th

In November 2020, Mr. Keller flew to Washington, D.C., in order to attend a political event in Freedom Square.  The subject of the event was the recent presidential election, with then- President Trump's supporters gathering to voice their concern over perceived election irregularities—Mr. Keller was among these supporters.  The daylight portion of the November event took place on a sunny Saturday afternoon and occurred peacefully, leaving Mr. Keller feeling invigorated and engaged in the political process.  It was within this same spirit of political engagement that Mr. Keller traveled to Washington, D.C., in January 2021; however, Mr. Keller was totally unaware of the maelstrom that would soon unfold and become the infamous January 6 Riots.

On January 5, 2021, Mr. Keller and his friend arrived in the DMV area to attend the next day's political events in Washington, D.C.  The advertised subject matter being addressed at the January 6 event was revealing supposed "new information" concerning the recent presidential election and alleged irregularities in the voting process.  As such, on January 6, Mr. Keller and

---

[1] Mr. Keller was arrested on January 14, 2021, in the District of Colorado and released on personal recognizance; his initial appearance in the US District Court for the District of Columbia was conducted on January 22, 2021, and he was placed on Supervised Release.  Dkt. 8 (Conditions of Bond).

his friend departed their hotel room mid-morning and arrived at The Ellipse to hear the event's keynote speakers and pundits.

Once at The Ellipse, Mr. Keller and his friend listened to most of then-President Trump's speech; however, given that no "new information" was being revealed, combined with the fact that it was windy and cold, they left the Ellipse and made their way to the food and vendor trucks located near the Capitol building.  Once near the Capitol building, Mr. Keller could observe an ever-growing crowd making its way toward him and the nearby Capitol building.  Shortly after the crowd arrived en-mass, Mr. Keller could smell the odor of tear gas and witnessed people climbing the inaugural scaffolding; "I sensed a more somber, intense energy in the crowd for the first time.  Looking back, I should have recognized the potential danger and gone back to the hotel." **Exhibit 1, pg. 5 (Klete Keller's Letter to the Court)**.  Indeed, this was Mr. Keller's first admitted error, not immediately turning around and leaving the Capital vicinity once the crowd started to form.

Unfortunately, however, Mr. Keller chose to remain on the premises and proceeded to join a loosely formed line of individuals seeking to enter the Capitol building proper:

> "I am embarrassed to admit that I chose to move forward despite signs of trouble.  I wanted to see what happened next, so I joined a line that had formed to enter the Capitol.  I knew I shouldn't be there, but it seemed like an act of civil disobedience [at the time].  I entered the Rotunda and followed some people down the Ohio Clock Room hallway.  I shouted out obnoxious, hostile slogans at law enforcement officers who were doing their job to protect Congress."

Ex. 1, pp. 5-6.

Mr. Keller spent roughly 50 minutes inside the Capitol building with other protesters, leaving through the East Rotunda Doors at 3:30 p.m.  The sum total of Mr. Keller's actions while inside the Capitol building can be described as follows: mulling around the Rotunda taking pictures and videos, observing a group of protesters near the Ohio Clock Room engaging with a

line of police officers—during which time Mr. Keller yelled, "F*** Nancy Pelosi" and "F***

Chuck Schumer," Dkt. 25, pg. 2 (Keller Statement of Facts)—and brushing aside a police

officer's hand from his arm who was attempting to direct the larger crowd out of the Rotunda.

Indeed, a Metro Police Officer, whom the government interviewed about Mr. Keller's behavior

in the Capitol, described Keller's conduct while in the Rotunda as follows:

```
███████████████████████████████████. In the Rotunda, ██████ was
trying to funnel people out the door and keep the exit open to get them out
the door. People were told to leave the Rotunda and the officer remembers
people not complying. He said then you had to push them to move them
along.

██████ described the subject, KELLER, as not listening to officer's
orders to leave the Rotunda. ██████ tells the crowd to "go to the right,"
which is the exit. ██████ believes the subject falls into the category of
folks who were passive resistant and obstructing the goals of clearing the
Rotunda.
```

*See* CAPD_2900 (FBI 302, Interview of Metro PD Officer).

   To be clear, Mr. Keller's limited involvement in the January 6 riots was serious and

beyond juvenile and foolhardy.  However, as the Officer stated, Mr. Keller was in that category

of individuals who "were passive resistant and obstruct[ive][.]" At no point did Mr. Keller

commit, or even contemplate committing, any acts of physical violence, nor did he deface

property or otherwise cause harm.

   Moreover, since his arrest, Mr. Keller has never tried to defend his behavior that day,

attempt to deflect blame by calling himself a "citizen journalist" (somehow entitling him to be

present that day) or take any other steps to minimize or justify his behavior.  Foolishly, however,

after leaving the Capitol building that day, and after the magnitude of what had transpired started

to dawn on him, Mr. Keller disposed of his Olympic Jacket and cellphone—behavior that Mr.

Keller has never denied and fully admitted to in his plea agreement.  Nevertheless, Mr. Keller

surrendered to authorities five days after the aforementioned conduct and was placed on pre-trial trial supervision on January 22, 2021—and has remained on supervision ever since.  *See* **Exhibit 2 (Records of Keller's Pre-trial Release Check-ins)**.

What's more, Mr. Keller was one of the first individuals charged in the January 6 cases who chose to accept responsibility for his role in that day's event, plead guilty to a felony, and publicly agreed to cooperate with the government.  Indeed, given his reputation, Mr. Keller's action in taking responsibility early on in the January 6 prosecutions set an example for other defendants to follow suit—to both take ownership of their individual conduct in bringing about that day's horrific events and to assist the government in its effort to bring those responsible to justice.  Unfortunately, as a collateral consequence of Mr. Keller's early acceptance and public agreement to cooperate with the government, he has been the target of repeated harassment—and in some rare cases, veiled threats—by extreme elements from both the left and the right.  Though Mr. Keller has brought to the government's attention any threat he has experienced at the hands of the vigilante "internet mob," in all likelihood, he will continue to be dogged by such communications for the foreseeable future.

In addition to Mr. Keller never attempting to deflect blame for his behavior and taking responsibility for his conduct early on, Mr. Keller has repeatedly expressed his deep and wholehearted remorse for his participation in that day's events:

> "Your Honor, I am ashamed of my reckless decision to enter the Capitol without permission.  I regret participating in an illegal demonstration to obstruct a joint session of Congress.  I broke important laws that protect the public servants who work at the Capitol.  Looking back, I wish I had not joined the rally at the Capitol.  My presence and behavior contributed to a volatile situation that got out of control and hurt innocent people.  I accept full responsibility for my actions and will never make bad choices like this again."

Ex. 1, pg. 6.

"On January 6, I made one of the worst decisions of my life by entering the US Capitol building and remaining inside until I was forced out by police officers. It was a decision I made entirely on my own – one that I sincerely regret and apologize for. While inside, I chose to yell obscenities and act uncivilly. My behavior contributed to and emboldened some of the ugly and dangerous actions seen that day for which I am truly sorry. I apologize to the police and lawmakers present on January 6th and to the American people."

PSR, pg. 8, ¶37.[2]

Indeed, illustrative of Mr. Keller's profound remorse for his role in the January 6 event is the story Mr. Keller imparted to the government during one of his many debriefing sessions. Clearly emotional, Mr. Keller retold the story of encountering a young child and his father on the metro while he was leaving the Capital. During that metro ride, a young boy who recognized Mr. Keller's Olympic jacket approached him to inquire whether Mr. Keller was, in fact, an Olympic athlete. Delighted by this chance encounter while on the metro, the young boy asked about Mr. Keller's Olympic career and requested to take a photo with him. Clearly, this young boy looked up to Mr. Keller as an adult role model who had reached the height of success in the athletic world and was clearly awestruck to meet one of his heroes in person. Immediately after meeting the young man and his father, Mr. Keller recounted feeling entirely overwhelmed by the feeling of shame and disappointment; he let this young man down by behaving the way that he did, and the moment that this young man and father find out what he did, their admiration for him would be shattered. Indeed, their feelings of enthusiasm and joy towards Mr. Keller, as he stated to the government, were undeserved after what he just did at the Capitol. As the government could undoubtedly recall, Mr. Keller was deeply moved by his encounter with this young man and the profound shame and regret that this experience evoked within him.

---

[2] All cites to the Pre-Sentence Report ("PSR") contained herein are in reference to the Draft Pre-Sentence Report provided to Counsel on June 2, 2023. *See* Dkt. 46. As of the date of the instant submission, the Final PSR had not been completed and filed by the Probation Office.

To be sure, Mr. Keller's conduct while at the Capitol was serious and worthy of punishment. However, for the reasons stated below, a prolonged probationary sentence and order of restitution is commensurate with Mr. Keller's actual conduct while at the Capitol on January 6, while also taking into account the substantial period of time that Mr. Keller has already spent on pre-trial probation—nearly three years—and his continued cooperation with government investigators.

## II.    A Sufficient Sentence Under 18 U.S.C. § 3553(a)

Since *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has required district courts to consider *both* the United States Sentencing Guideline ("U.S.S.G") range and the sentencing factors set out in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence. As such, sentencing courts are instructed to first correctly calculate the Guideline range for a given defendant, then consider the § 3553(a) factors to determine whether a sentence within the Guideline range is appropriate or whether a departure or variance from the Guidelines is warranted. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Indeed, by enacting 18 U.S.C. § 3553 Congress has *directed* that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in the statute.[3] Additionally, the Supreme Court has held

---

[3] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the

that sentencing courts are required to "consider what sentence is appropriate for *the individual defendant* in light of the [§ 3553(a)] sentencing factors," *Nelson*, 555 U.S. at 351 (emphasis added), to ensure that the punishment imposed in a particular case "fit[s] the offender and not merely the crime[.]" *Williams v. New York*, 337 U.S. 241, 247 (1949); *see also Spears v. United States*, 555 U.S. 261 (2009) (explaining that the Sentencing Guidelines cannot be used as a substitute for a court's independent determination of a just sentence based upon consideration of the statutory sentencing factors).

Here, the parties and the Probation Office agree as to the "correct" advisory guideline calculation. However, since the parties signed their plea agreement in August of 2021, the United States Sentencing Commission and Congress have made substantial amendments to portions of the Guidelines applicable to Mr. Keller's case.[4]  *See* U.S.S.G §1B1.11(a) ("[t]he court *shall* use the Guidelines Manual in effect on the date that the defendant is sentenced[]") (emphasis added). First, the Commission added new Guideline section 4C1.1, under Chapter 4—Criminal History. Specifically, new section 4C1.1 provides for the *decrease* of two offense levels if the defendant meets all of the following criteria:

> "(1) the defendant did not receive any criminal history points []; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in

---

law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

[4] Counsel raises the recent U.S.S.G. Amendments in furtherance of Keller's argument for a variant sentence. Indeed, given that the Sentencing Commission has seen fit to change how the guidelines apply to individuals with no criminal history points (such as Mr. Keller) through new §4C1.1 and §5C1.1 App. n.10(B)—explicitly making the recommended Guidelines Sentences for this class of individuals more lenient across the board—the requested variant sentence in Mr. Keller's case is all the more warranted.

death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving [Civil] Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise[.]"

U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines—Preliminary, pg. 72 (April 5, 2023).[5] *See also* U.S. SENT'G COMM'N, Amendments to the Sentencing Guidelines, Retroactive Application, pp. 1-2 (Aug. 31, 2023) (explaining that the effective date of §4C1.1 was Nov. 1, 2023, because "the policy reasons underlying []the amendments apply with equal force to individuals who are already sentenced;" while also stating that the amendments to the Guidelines recognize the fact that "*individuals with zero criminal history points have considerably lower recidivism rates than other sentences individuals*") (emphasis added).[6]

Here, it is submitted that had Mr. Keller's plea agreement been signed after November 1, 2023, he would have been entitled to the new §4C1.1 decrease of two offense levels for being a Zero-Point Offender. As previously mentioned, Mr. Keller has no criminal record, and plainly, Mr. Keller's offense conduct did not implicate any of the exceptions found in §4C1.1—this is not a terrorism offense; Mr. Keller did not use violence or credible threats of violence in connection with his offense nor did his conduct result in death or serious bodily injury; the instant offense of conviction is not a sex offense; Mr. Keller did not personally cause substantial financial hardship; no firearm was used during Mr. Keller's offense; the instant offense of conviction is not covered

---

[5] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

[6] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202308_RF-retro.pdf.

by §2H1.1 (Offenses involving Civil Rights); Mr. Keller did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and finally, Mr. Keller did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise.

The government objects to Mr. Keller receiving a two-level reduction under §4C1.1.  *See* Gov't Objections to Draft PSR, pg. 1 ("the government submits that [§]4C1.1—intended for certain categories of non-violent, low-level offenders and crimes—is not applicable to the January 6th attack on the Capitol generally[.]")  However, despite the government's apparent general consternation regarding the application of §4C1.1 to an entire class of individuals—i.e. January 6 defendants—such an all-purpose, broad, and vague objection is not a basis for denying this specific defendant, an individual with no criminal history and a first-time criminal offender, an adjustment as a Zero-Point Offender.

In determining whether a given guideline applies to a specific case, a sentencing court must first examine the guideline's plain text.  *See United States v. Campbell*, 22 F.4th 438, 444 (4th Cir. 2022) ("[i]t is the guideline's text, of course, that takes precedence, and so that is where we begin. And in doing so, if possible, we will give a guideline's text 'its plain meaning'") (internal citations omitted).  Here, the plain language of §4C1.1 *directs* the court to decrease the offense level attributed to the defendant if, after examining the conduct of the specific offender and his individual actions, the defendant meets the following criteria:

"(1) *the defendant* did not receive any criminal history points []; (2) *the defendant* did not receive an adjustment [for a Terrorism offense]; (3) *the defendant* did not use violence or credible threats of violence in connection *with the offense*; (4) *the offense* did not result in death or serious bodily injury; (5) *the instant offense* of conviction is not a sex offense; (6) *the defendant* did not personally cause substantial financial hardship; (7) *the defendant* did not possess [] a firearm or other dangerous weapon []; (8) *the instant offense* of conviction is not covered [by §2H1.1]; (9) *the defendant* did not receive an adjustment [for] (Hate Crime Motivation or Vulnerable Victim) or [](Serious Human Rights Offense); and (10)

> _the defendant_ did not receive an adjustment [for an Aggravating Role] and was not engaged
> in a continuing criminal enterprise[.]"

U.S.S.G. §4C1.1(a)(1)-(10) (emphasis added).  Additionally, the guideline's text provides the

Court no discretion in its application, "[i]f the defendant meets all of the following

criteria[]...decrease the offense level determined under Chapters Two and Three by 2 levels."  _Id._

The plain text of §4C1.1 clearly mandates that this Court look at Mr. Keller and his

specific conduct when determining his eligibility for a Zero-Point Offender reduction and not, as

the government would pose, the conduct of the general masses.  As stated above, Mr. Keller

plainly meets all the criteria set out in §4C1.1.  Additionally, the government broadly proclaims

that because the January 6 Riots were "a violent attack[,]" §4C1.1 should not apply to any

defendant "whether or not they personally engaged in violence or personally threatened

violence[.]" Gov't Objections to Draft PSR, pg. 1.  However, again, the government's overly

vague and sweeping argument misses the mark.  In looking at the specific conduct at issue here,

as §4C1.1 requires, Mr. Keller was, as stated by the metro police officer who personally observed

him, a "passive resistant and obstruct[ive]" participant—hardly a person engaging in violent acts.

_See_ CAPD_2900; s_ee also United States v. Dorcely_, 454 F.3d 366, 375 (D.C. Cir. 2006) ("[u]nder

the Guidelines, the sentencing range for a particular offense is determined on the basis of all

'relevant conduct' _in which the defendant was engaged..._") (emphasis added) (internal citations

omitted).

Indeed, underpinning its rationale for drafting §4C1.1, the Sentencing Commission stated

that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal

history points ("zero-point" offenders) have considerably lower recidivism rates than other

offenders, including lower recidivism rates than the offenders in Criminal History Category I

with one criminal history point." U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, Amendments to the Sentencing

Guidelines—Preliminary, pg. 71-72 (April 5, 2023).[7]  The government responds to the
Commission's empirical data by offering the blanket statement that "[g]iven the unprecedented
nature of the Capitol attack, there is no reason to believe this historical data is predictive of
recidivism for defendants who engaged in acts of political extremism on January 6[,]" Gov't
Objections to Draft PSR, pg. 2.  Put simply, the government's naked assertion is mere
speculation not grounded in any discernable fact or data.  In fact, as demonstrated simply by the
dates of the preliminary reports issued by the Commission (April 5, 2023, and August 31, 2023),
the Commission and legislators were well aware of the January 6 prosecutions during §4C1.1's
drafting.  However, despite this, the Commission and Congress choose not to exempt these
crimes or defendants from the reach of §4C1.1—indeed they saw fit to make the guideline apply
retroactively *in all* criminal cases.  Denying Mr. Keller a two-level reduction based on the thinly
supported arguments advanced by the government would write into the Guidelines a criteria
which the Commission was aware of, but did not adopt.  *United States v. Bradley*, 644 F.3d 1213,
1290 (11th Cir. 2011) ("…courts must not speculate concerning the existence of a fact which
would permit a more severe sentence under the guidelines. Rather, [] the Government must
establish those facts by a preponderance of the evidence.") (internal citations omitted).  As such,
applying new §4C1.1 to Mr. Keller's case would result in an advisory Guideline range of 15-21
months.

        Moreover, in addition to the changes in Chapter 4, the Commission also added new
Application Note 10(B) to §5C1.1 (Imposition of a Term of Imprisonment) addressing

---

[7] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf.

"nonviolent first offenders" such as Mr. Keller.  *See* U.S. SENT'G COMM'N, Amendments to the

Sentencing Guidelines, pg. 82 (April 27, 2023).[8] Specifically, the new application note provides:

> "that a departure, including a departure *to a sentence other than a sentence of imprisonment*, may be appropriate if the offender received an adjustment under new §4C1.1 and the applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

*Id.*  (emphasis added).

Given that Mr. Keller appropriately receives an adjustment under new §4C1.1, combined

with the specific factual underpinnings of his offense of conviction, any term of active

incarceration would "overstate[] the gravity of [Mr. Keller's] offense[,]" even accounting for the

revised Guidelines' range.  U.S.S.G. §5C1.1, App. N. 10(B).  As previously stated, Mr. Keller did

not assault a single person during his stay at the Capital, nor did he deface any public or private

property.  However, to atone for adding his voice and support to those rioters that day, Mr. Keller

took the very large step of pleading guilty to a felony offense, a conviction that carries a host of

collateral consequences that will follow him for the remainder of his life.  Indeed, on top of

becoming a life-long felon, Mr. Keller also publicly agreed to cooperate with law enforcement

early on during the investigations concerning the January 6 incident—inspiring others in his

position to do the same, a fact acknowledged by the government and discussed further below.

For all of these reasons, and those enumerated below, and notwithstanding the parties

stipulated U.S.S.G.'s recommendation of 21 to 27 months imprisonment, or the government's

revised sentencing recommendation of 13 months, a variant probationary sentence and restitution

is warranted in this case.

---

[8] Available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf.

### a.   Klete Keller's Personal Background and History

Mr. Keller was born in Las Vegas, Nevada, in 1982 to married parents as the second of three children.[9]  When Mr. Keller was around three years old, his family moved to Running Springs, California, to be near his paternal grandparents—who owned and operated a popular local restaurant.  During his formative years, Mr. Keller worked side by side with his parents at the family restaurant; indeed, he has fond memories of working with his parents at his grandparents' restaurant, bussing tables, filling customers' water cups, interacting with the customers and their families, and generally helping out.

During these early years, Mr. Keller enjoyed perfect attendance and excellent grades at his public elementary school, and he was particularly close with his father, who often took Mr. Keller skiing.  Mr. Keller's mother, in her youth, was an exceptionally gifted swimmer, and Mr. Keller showed signs early on of inheriting both his parents' athletic talents—breaking his first swimming record when he was merely eight years old.

When Mr. Keller was in seventh grade, he, his mother, and sisters moved into an apartment near Phoenix, Arizona—to be close to his maternal grandparents—and his father relocated to San Francisco.  Unfortunately, Mr. Keller's parent's marriage became estranged, the result of an extra-material affair, leading to a great deal of rancor between his parents— witnessed by the children—and resulting in his father being largely absent from the family for a period of roughly five years.  Indeed, it is heartbreaking to hear Mr. Keller describe, to the PSR writer, his upbringing from this point forward:

> "[Mr. Keller] described the family situation as [']contentious['] as there was much
> [']acrimony['] and arguing between his parents.  He commented that his parents did not
> have much time for their children and *[']parented through fear and threats of adoption*.[']

---

[9] Mr. Keller's mother and father are now respectively 70 and 72 years old, and his two sisters are 44 and 37.

> He reported that both of his parents were physically, verbally, and emotionally abusive during his formative years.  He stated that he was struck with a tennis racket and the welts and bruises would linger for weeks so that he could not go to school or swim practice."

PSR, pg. 10-11, ¶59 (emphasis added).  Sadly, but not unexpectedly, due to the abusive environment that came to mark his formative years, Mr. Keller became alienated from his family and has not had contact with his parents or older sister in many years.  However, and to his credit, Mr. Keller does not hold animosity towards his parents: "Your Honor, I am thankful for all my blessings growing up in California and Arizona.   Despite conflict at home, my parents both worked hard to provide a secure life for my sisters and me.  My grandparents on both sides cherished and supported me." Ex. 1, pg. 2.

Notwithstanding his rough upbringing and feelings of rejection by his own family, Mr. Keller did have one passion and outlet growing up, and that was swimming:

> "As my home life grew more toxic, my social life and grades suffered.  I felt myself shutting down and tuning out to block out the negativity.  Thankfully, I could depend on swimming as an emotional release and safe harbor.  I practiced for about 18 hours each week.  Starting in my senior year, I felt myself coming into my own as an athlete."

Ex. 1, pg. 2.

In the summer of 2000, Mr. Keller had recently graduated from high school when he broke the twelve-year-old American record in the 400-meter freestyle, twice, and qualified for the 2000 Olympic Team (held in Sydney, Australia) in both the 400-meter freestyle and the 4 x 200 freestyle relay.  At the Sydney Games themselves, Mr. Keller won an individual bronze medal in the 400-meter freestyle event, after which his coach made him the anchor leg of a relay that won a silver medal.



With Mr. Keller's performance at the 2000 Sydney Games, his Olympic star was born.[10] Following the 2000 Games, Mr. Keller enrolled at the University of Southern California and joined the National Collegiate Athletic Association ("NCAA") swim team.  While in school, Mr. Keller suffered academically—entirely of his own doing, the result of an active social life and his inability (at the time) to properly manage his time, a life skill that evades many young men that age.  In 2002, to help himself "buckle down," Mr. Keller moved to Ann Arbor, Michigan, to train with the University of Michigan swim team and enroll at Eastern Michigan University to continue his college education.  It was also during this period that Mr. Keller obtained a professional sponsorship from the swimwear maker Speedo—which enabled him to have the financial resources to dedicate the majority of his time to training.

In 2004, after much hard work and intensive training, Mr. Keller qualified in the Athens Olympic Trials in Long Beach, California, for three events—the 200-meter Freestyle, the 4 x 200-meter Freestyle Relay, and the 400-meter Freestyle.  At Athens, in the Freestyle Relay, Mr.

---

[10] Mr. Keller's Olympic profile can be found on the Official website of the Olympics, available at: https://olympics.com/en/athletes/klete-keller.

Keller and his teammates faced a monolith of a competitor—the Australians, particularly Ian Thorpe.  Indeed, at the time of the 2004 Athens games, Australia hadn't lost the race in seven years, and Ian Thorpe anchored their team—while Mr. Keller was set to anchor the American team.  To say that the American team was viewed as an underdog in this race might be an understatement:

> "On paper, the Aussies should've won the race.  With a team full of talent and eager to repeat their victory from 2000, they were any smart better's wager to win.  Their team consisted of four swimming juggernauts: Grant Hackett, a renowned distance specialist with multiple World Championship and Olympic gold medals under his belt; Michael Klim, mid-distance specialist and former 100 fly world record holder; Nicholas Sprenger, up-and-coming middle distance swimmer and cousin of top-tier breastroker Christian Sprenger; and, of course, Ian Thorpe, the multiple-time world record holder and world and Olympic champion who was widely known as the greatest swimmer in the world."

*Shouts from the Stands: Relive the Legendary 800 Free Relay from Athens*, Pat Pema,

SwimSwam News Organization (Jun 5, 2019).

However, as though played out as a scene from a Hollywood movie, the American underdogs went on to clench victory away from the long-running champions:[11]

> "Many swim fans will remember the final leg of the men's 4×200 freestyle relay from the 2004 Athens Olympics.  In an incredibly tight finish, this fantastic race saw American Klete Keller hold off Ian "The Thorpedo" Thorpe during the final leg of the just over 7-minute long race. Shocking the Australian team and the world, Klete Keller and his teammates set a new American record and gained recompense for the Australians' victory in [2000].
> ****
> The spectators and both relay teams stood shocked as they flipped for the final 50 with Keller maintaining a slight lead. Coming down to the last few meters, the stands and the pool deck were wild with cheer.  As they touched and the scoreboard registered the USA team's time as .13 faster than the Australians, everyone knew that Klete Keller had done the impossible in holding off the world's greatest swimmer… With the fastest split by an American ever on the 800 free relay, Klete Keller proved that swimming is largely a sport of willpower and heart.  Diving in for his last leg, he knew what needed to be done, and made it happen despite having the knowledge of being up against Ian Thorpe.  He didn't let the fear get to him, and the circumstances he was in gave him strength.  During his

---

[11] Articles can be found at: https://swimswam.com/shouts-from-the-stands-relive-the-legendary-800-free-relay-from-athens/ and
https://www.southcoasttoday.com/story/sports/2004/08/18/keller-holds-off-thorpe/50322729007/

swim, he dug deep and did the impossible. He demonstrated that underdogs always have a fighting chance, and that he had what it took to anchor one of the most highly contested and anticipated relays in the Olympics." *Id.*



" 'This race will go down as one of the greatest in history,' said Phelps, who helped the Americans avenge the loss to Australia four years ago in Sydney. 'I was like, 'Come on, Klete! Hold on! Hold on!'' I knew Klete would come through. His swim was the reason why we won that relay. He held off the fastest 200 freestyler in history."  Phelps and the other U.S. swimmers, Ryan Lochte and Peter Vanderkaay, hopped up and down on the deck as Keller dug for home. When he touched first -- his hand just ahead of Thorpe's -- Phelps showed more emotion than he has at the entire Olympics. The teenager threw up his arms and screamed "Yeaaahh!" toward the jubilant American contingent in the stands. "I don't think I've ever celebrated like that in my entire life," Phelps said. "They've owned that race for so long." Keller pulled himself out of the water and joined his teammates in a raucous hug. A dejected Thorpe walked over and shook hands with Keller." *Keller holds off Thorpe*, Paul Newberry (AP Writer), THE STANDARD-TIMES (Aug. 18, 2004).

[Top] Keller, bottom, swam the anchor leg when the United States won the 4x200-meter relay gold at the 2004 Athens Games. (Photo Credit: David Gray/Reuters)

[Bottom] The U.S. gold-medal-winning 800-meter freestyle relay team at the 2004 Olympics in Athens, from left: Michael Phelps, Ryan Lochte, Peter Vanderkaay and Klete Keller. (Photo Credit: Pierre-Phillippe Marcou / AFP/Getty Images)



At the Athens games, Mr. Keller went on to earn an individual Bronze in the 400-meter Freestyle and place fourth in the 200-meter Freestyle.  Mr. Keller's Olympic career was not over however, and in 2008, during the Beijing games, Mr. Keller also secured a gold medal in the 4 x 200-meter Freestyle relay.  Put simply, Mr. Keller has had a remarkable career as a professional athlete; he is a three-time U.S. Olympian in swimming, winning a total of five medals— including two golds—during the span of his career.

In the Fall of 2008, Mr. Keller married his long-time girlfriend and returned to the University of Southern California to complete his degree in Public Policy and Development.  Ex. 1, pg. 4.  Attempting to find a new path forward outside of athletics, Mr. Keller tried his hand at selling life insurance and annuities for Northwestern Mutual.  Mr. Keller and his wife welcomed their first child, a daughter, in January 2010, and then a little over a year later in April 2011, they welcomed their twin boys into their new family.

Unfortunately, Mr. Keller's life took a harsh and dark turn following his retirement from professional swimming.  Attempting to secure better opportunities for his growing family, Mr. Keller accepted employment with a North Carolina financial services firm.  Mr. Keller's wife and children moved ahead of him to North Carolina while Mr. Keller went to Tennessee to undergo company training—necessitating that he commute from Tennessee to North Carolina during the weekends to see his family.  Sadly, Mr. Keller's family could not ensure the long-term separation, and Mr. Keller and his wife separated in January 2014.  Compounding Mr. Keller's personal problems, the day after separating from his wife, Mr. Keller's employer terminated his employment for underperformance.  Ex. 1, pg. 4.

As part of the then-existing separation agreement between Mr. Keller and his now ex-wife, Mr. Keller was required to have a full-time job in order to visit his children.  Shockingly,

given the financial constraints of having to pay child support and personal expenses, Mr. Keller

lived in his car for nearly a year while working for a construction company and two other part-

time jobs:

> "[Keller] was paying child support for [his] kids and couldn't afford a place, so [Keller]
> lived in [his] car for almost a year[.] Keller, a 36-year-old who retired after his third
> Olympics in 2008, said, according to USA Swimming. "I had a Ford Fusion at the time, so
> at 6-foot-6, it was challenging to make the room to sleep. But I made it work."  Keller, who
> has three kids, was jobless and homeless.  "He alternated parking at one of the two Wal-
> Marts in his area and at rest stops and kept his gym membership active so he had
> somewhere to shower and workout," according to the story."

*He won a gold medal with Michael Phelps, then he lived in his car*, Nick Zaccardi, NBC SPORTS

(Jun 22, 2018).[12]

Using the limited funds he had saved—after paying child support and other obligations—

in October of 2017, Mr. Keller relocated to Colorado, where he was offered a position as a

residential real estate agent.  As Mr. Keller states, during the next three years, "I visited my

children monthly in North Carolina and spoke to them via FaceTime every Sunday.  We made up

for lost time with trips to the Whitewater Center, national forests, and the Virginia Creeper

National Recreation Trail.  We did outdoor activities like hiking, mountain biking, and going to

the driving range.  I loved every minute of our time together."  Ex. 1, pg. 5.

Despite a good track record of visitation with his children and his ability to secure stable

employment, in October of 2020, during a hearing to establish a permanent visitation and

custody order, the local judge declined to give Mr. Keller additional visitation with his children

and this loss greatly affected Mr. Keller: "My shock at the result of the hearing turned into

simmering anger and a profound sense of injustice which I struggled to move past." Ex. 1, pg. 5.

---

[12] Available at: https://www.nbcsports.com/olympics/news/klete-keller-swimming.

Indeed, Mr. Keller's disillusionment with the separation and custody proceeding regarding his children directly—occurring a mere three months before the January 6 riots—affected his judgment and led to his decision to partake in the conduct underlying the instant offense:

> "Your Honor, many people survive agonizing personal challenges. They do not all go on to break the law like I did.  In this case, I let my emotions distort my good judgment.  I crossed a line and I understand that I must be held accountable…
>
> ****
>
> I let events in my personal life affect my outlook and actions in the runup to January 6th.  I was angered and disillusioned by my experience in the family court system.  I felt my relationship with my children was taken from me without any consideration of the facts.  I felt similarly with the way election irregularities were seemingly dismissed and discussion of the same was squelched.  I conflated my feelings with each situation and devolved into a state where I allowed my emotions to influence my actions, which I sincerely regret.  I've learned an important lesson in managing my emotions and behavior."

Ex. 1, pp. 5-6.

As a direct result of Mr. Keller's conduct in the instant offense, his ex-wife stopped regular visitation.  PSR, pg. 11, ¶62.  As reported to the PSR writer, Mr. Keller's last in-person contact with his children was in December 2021, and his last telephonic contact was in March 2022.  Feeling as though his relationship with his children had "deteriorated" past the point of no return and that continued contact with his children would no longer benefit them, in April 2022, Mr. Keller signed the necessary paperwork for his children to be adopted by their new stepfather.  As such, and as a direct result of his participation in the January 6 Riots, Mr. Keller permanently lost his children, a punishment more significant than any a court could order.  Compounding matters, because of his involvement with the events at the Capitol, Mr. Keller's employer felt the need to sever their relationship with him and terminated his employment.

However, despite these recent hardships in his life, Mr. Keller has now finally arrived at a place where he is back on track in both his personal and professional life.  Mr. Keller now has

stable employment and is considered an integral member of his employer's business.  Mr. Keller was also lucky enough to find love a second time around and married his current wife in the spring of 2022.  As the proceeding section makes clear, Mr. Keller now has the strong family, community, and professional support in place to live a positive and meaningful life.

Indeed, Mr. Keller has finally arrived at a place in his life where he is stable and able to grow as a contributing member of his local community.  It is for this, and the below-stated reasons, that this Court should impose a probationary sentence; such a sentence would provide a just punishment for Mr. Keller's action while at the same time not destroying the substantial gains and effort that Mr. Keller has made since his instant conviction in this matter.

### b.  *Community Support and Personal Characteristics*

As is made readily apparent from the letters of support submitted to this Court, Mr. Keller is known as a profoundly hardworking and caring individual.  Indeed, what stands out the most in reviewing the numerous letters submitted is how individuals who know Mr. Keller describe him.  One of his current bosses states, "Klete Keller is genuinely one of the kindest men I have ever met. He has made a tremendous impact, not only on our business, but on my family and community." **Exhibit 3, pg. 002 (Keller Character Letter Packet)**; a fellow co-worker writes, "[o]ver the years I've had a good chance to get to know Klete…I can say for being an Olympic caballer athlete he is by far the humblest person I know.  He projects generosity, humor, pure fun, and praise to not only me but everyone in the office." Ex. 3, pg. 005; a neighbor of Mr. Keller for six years adds that "[a]s an Olympian, and a medal winner at that, [Mr. Keller] carries tremendous humility. He never brags or boasts about that incredible chapter in his life."  Ex. 3, pg. 007; finally, a close family member states that Mr. Keller "almost gets embarrassed if people ask him about his athletic experience.  He downplays his swimming career and he certainly does

not think he is better than others because of his athletic accomplishments. [Mr. Keller] brings

humility into his service and care for others." Ex. 3, pg. 008.

Moreover, and importantly here, Mr. Keller has not only expressed his remorse for his

involvement in the instant offense to government and court officials, but he has also repeatedly

expressed his regret and shame to his family, friends, and co-workers back at home.  Indeed, Mr.

Keller's current employers—who had initially fired him for his involvement in the instant

offense—expressly hired him back because of how he handled being terminated:

> "Immediately following the January 6th incident, we met with Klete and asked him to
> tender his resignation from our company... While we believed in Klete as a person, after
> careful consideration, we decided on a separation.  Klete's response was profound. If I had
> sensed an attitude that he was bitter, it was not his fault, or he was being treated unfairly, it
> would have been difficult to bring him back. Instead, it was just the opposite.  Klete was
> remorseful for any harm he had caused the company. He took full responsibility for his
> poor decisions that put himself, his family, and our company at risk.  He professionally
> transitioned client files and projects he was working on to others in the firm.  I cannot stress
> how much I respect Klete for how he handled everything[.]"

Ex. 3, pg. 002.  Within that same vein, one of the owners of the firm in which Mr. Keller is

employed and his direct supervisor states in relevant part that:

> "My husband and I understand the gravity of the crime Klete committed, and we do not
> support his actions on January 6th. After witnessing Klete's sincere regret for those actions
> and learning that he was not violent or destructive we decided to continue our personal and
> professional relationship with him.  Recently, a client of our company asked Klete, "If you
> could go back in time, would you have gone to the capital?" He emphatically responded,
> "No way I wish I could take it all back and I am extremely sorry for and embarrassed by
> what I did." He has always sincerely expressed remorse whenever the topic of January 6th
> has come up."

Ex. 3, pg. 001; *See also* Letter from a co-worker and Managing Broker, Ex. 3, pg. 015:

> "I remember receiving a call from Klete approximately January 15th, 2020. He called to
> apologize to me and to all of the people that work in Ohio under [Employer] for the mistake
> that he made. He knew that his actions would have an impact on [Employer] that would
> trickle down and affect everyone that works here.  He was right.  He accepted full
> responsibility for his actions and could not have been more remorseful.  Based on all the
> above, I have forgiven him."

Mr. Keller has not only expressed his remorse in his professional setting but has done so with members of his local community as well, with his neighbor of six years writing:

> "When it comes to the January 6 incident, he shakes his head and says, "I never should have been there." Of course, with the charges pending he can't tell me much about that day other than expressing regret for a very poor judgement [sic] call.  I know if he could have another go at it, he would choose to never be in D.C. for that rally and events resulting from it.  Since his arrest he has tried to make the most of each day and has maintained a positive attitude and work ethic."

Ex. 3, pg. 007.

Finally, not only has Mr. Keller expressed remorse within his local professional and personal community—thus proving to be an example, yet again, to others charged with a similar offense—he has taken the time to give back to that community:

> "My wife and I now own and operate an athletic training center that specializes in swimming.  Without me ever asking him, [Mr. Keller] has volunteered for our fundraisers, including offering to take groups of young swimmers out for lunch, giving them an opportunity of a lifetime via "lunch with an Olympian".  He is unbelievable with the kids. He not only shares stories of his experiences at the international level of sport, but also life lessons that have shaped him as a person.  He is humble, compassionate, and engaging. He makes a huge impact on them.  [Mr. Keller] has extended similar generosity to others in our community with free swim lessons and even just randomly shows up at swim meets or other events offering; he is interested in the community."

Ex. 3, pg. 004.

 Put plainly, Mr. Keller has done everything that we expect from an individual who engaged in a criminal act but wishes to accept responsibility for his conduct.  Mr. Keller pulled himself up from the ground when he realized that he had engaged in wrongdoing by cooperating with government officials—by quickly pleading guilty and assisting law enforcement officials— he worked hard to redeem himself with his employer (despite being terminated), continues to express remorse to all those he comes meets, and gives back to his community when he can by sharing his unique life experiences with his community's youth—attempting to be a role model of positive behavior and what an individual can do to change after they stumble in life.

### c. *Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence, and Protection of the Public*

In Mr. Keller's case, a probationary sentence would conform with the mandates of 18 U.S.C. § 3553(a) by respecting the seriousness of his offense, promoting respect for the law, and providing both specific and general deterrence.

Mr. Keller stands before this Court as a first-time criminal offender and now convicted felon. Despite any argument by the government to the contrary, and as plainly evidenced above, Mr. Keller has accepted responsibility for his role in the January 6th riot by pleading guilty to a felony, a conviction that will follow him for the remainder of his life. Indeed, Mr. Keller's acceptance of responsibility is recognized by the Probation Office in its' stating that Mr. Keller is one of the "extraordinary cases in which adjustments under both [U.S.S.G.] §§3C1.1 and 3E1.1 may apply," PSR pg. 8, ¶38, and who then proceeded to give him a three-level reduction for acceptance of responsibility.[13] *Id.* at ¶47, 48. Additionally, Mr. Keller's acceptance of responsibility for the conduct underlying his offense of conviction is clearly demonstrated by the prolonged cooperation he provided to the government. Mr. Keller sat down with the government whenever it requested, on numerous occasions, in sessions lasting hours over the course of the past two years. These repeated debriefing sessions with the government and Mr. Keller's continual and repeated agreement to postpone his sentencing to further assist the government each and every time it requested have resulted in the government seeking a downward departure from Mr. Keller's advisory guidelines range:

> "For nearly three years, Keller has cooperated with the government's investigation into the attack on the Capitol—repeatedly meeting with the government to describe everyone around him and everything that happened leading up to and on January 6. *He has provided*

---

[13] Mr. Keller's §3C1.1's enhancement derives from his disposal of a cellphone and Olympic Jacket immediately following the events of January 6th but before he knew he was the target of a criminal investigation.

*substantial assistance and has expressed remorse for his crimes….[Keller] has also shown genuine remorse and, more importantly, he has tried to right his wrong for nearly three years…*The government requests that this Court depart downward and sentence Klete Derik Keller to 10 months of imprisonment (approximately fifty percent below the bottom end of the advisory Sentencing Guidelines Range), 36 months of supervised release, $2,000 in restitution, and the mandatory assessment of $100.

Dkt. 51, pg. 2 (Government's Position on Sentencing) (emphasis added).

Mr. Keller was not self-serving in his cooperation with the government—seeking only to point the finger at other individuals and refusing to discuss his own conduct—in fact, he provided information about his own behavior that the government was unaware of and was potentially damaging: "[n]ot only did [Mr. Keller] discuss his actions the government knew about through video evidence, but he admitted to actions the government did not know about that increased his sentencing exposure." *Id*. at 28.

Indeed, as the government has recently acknowledged, Mr. Keller's decision to assist the government early on in its investigation has inspired others in his position to do the same:

"Keller's early public cooperation plea undoubtedly reached thousands of others weighing whether to turn themselves in, plead guilty, or even cooperate. Keller's public acknowledgment that his interference with the peaceful transfer of power was, in fact, a serious crime provided an important counterweight to the false narrative that January 6 was a peaceful, lawful protest. And many others have followed."

*Id*. Mr. Keller's contribution in this regard cannot be emphasized enough. Given his high-profile nature, Mr. Keller's decision to publicly assist the government and law enforcement investigators—and to do so over the course of years—has undoubtedly helped repair some of the damage that his contribution to the January 6 riots inflicted and further supports his sentencing recommendation of probation.

Though Mr. Keller disagrees with the government on its revised recommended sentence of 10 months of imprisonment, and instead submits that a probationary sentence in his case is

more appropriate, he is appreciative of the government's acknowledgment of his years of cooperation and assistance.

To that end, Mr. Keller has established an excellent track record while on years of pre-trial release, possesses a demonstrated history of lawful behavior, and has rebuilt his life at home—after losing his children and his job for his behavior on January 6—and is now enjoying a stable marriage and career.  Simply put, Mr. Keller has given this Court no reason to doubt that he will faithfully comply with the law in the future and no reason to fear that he will suffer a similar failure in judgment again.

Considering the sum total of Mr. Keller's actions in connection with the January 6 riot supports the position that no period of incarceration is warranted.  As previously stated, on January 6, 2021, Mr. Keller attended the President's "Stop the Steal" rally, after which he proceeded, along with hundreds of others, to the United States Capitol building.  After arriving inside the Capitol, Mr. Keller spent time in the Rotunda—taking pictures and videos—and the Ohio Clock Room hallway, where he shouted juvenile expressions about Nancy Pelosi and Chuck Schumer.  Importantly, Mr. Keller never made violent contact with any individual or police officer, with his only physical interaction consisting of "jerking his elbow" to avoid law enforcement officers who were attempting to direct the larger crowd out of the Rotunda.

The aforementioned conduct was ill-advised, reckless, and just plain foolish.  However, through criminal, Mr. Keller's behavior was non-violent and resulted in no physical injuries or property damage.  Though, in the past, the government has made the blanket statement that "the violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  *See* FBI Director Wray Statement before the House Oversight and Reform

Committee, EXAMINING THE JANUARY 6 ATTACK ON THE U.S. CAPITOL (June 15, 2021).[14]  It has

nevertheless "been uniform and constant in the federal judicial tradition for the sentencing judge

to consider every convicted person as an individual and every case as a unique study in the

human failings...."  *Gall v. United States*, 552 U.S. 38, 52 (2007).  The individual study of Mr.

Keller's conduct as it relates to the January 6th event is clearly different from others whom this

Court has punished.   Indeed, as discussed further below, the harm caused by Mr. Keller's

conduct is less severe than others who have received short prison sentences for the same

essential offense.

A probationary sentence here would recognize Mr. Keller's respect for the law and

provide a just punishment, especially in light of the punishment he has already undergone.

Indeed, "[p]robation is not an act of leniency.  Probation is a substantial restriction of freedom; it

is not forgiveness, and it is not an endorsement of the offense." *United States v. Myers*, 353 F.

Supp. 2d 1026, 1032 (S.D. Iowa 2005) (citation omitted).  The fact that Mr. Keller is seeking a

probationary sentence does not mean that he is seeking to be absolved of punishment as it is

"[i]nherent in the very nature of probation [] that probationers do not enjoy the absolute liberty to

which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (citations and

internal quotations omitted); *See also Gall v. United States*, 552 U.S. 38, 48 n.4 (2007);

("Probation is not granted out of a spirit of leniency. . . . As the Wickersham Commission said,

probation is not merely 'letting an offender off easily'") (citing Advisory Council of Judges of

National Council on Crime and Delinquency, *Guides for Sentencing* 13-14 (1957).

---

[14] Available at: https://www.fbi.gov/news/testimony/examining-the-january-6-attack-on-the-us-capitol-wray-061521.

As previously mentioned, Mr. Keller has been on pre-trial probation for nearly three years; in fact, Mr. Keller has performed hundreds of check-ins with his pre-trial officer, all without a single incident.  Given that Mr. Keller has been under constant government supervision for years—during that time, he faced the threat that his pre-trial bond would be revoked should he make one wrong step—combined with the fact that Mr. Keller effectively lost custody of his children for his participation in this offense; not requiring Mr. Keller to serve an active prison sentence would recognize the considerable constraints on his liberty he had already experienced and the losses he has already endured.

Moreover, putting to one side the cooperation Mr. Keller has provided the government over the years, Mr. Keller has also assisted the government in other ways—principally through his work with the Prison Professors Charitable Corporation.  *See* **Exhibit 4 (Letter of Support, Prison Professors)**.  Prison Professors is a 501(c)(3) organization dedicated to creating programs for incarcerated individuals and at-risk youth to assist them in their post-incarceration lives—specifically employment training programs and life skills.  In his volunteer work with this organization, Mr. Keller spent "scores of hours" creating a lesson plan and training course that currently incarcerated individuals can learn and benefit from.

Finally, despite the divisions that exist across the country, there are more effective ways to achieve the goal of general deterrence in this particular case than sending Mr. Keller to prison for any period of time.  According to the National Institute of Justice, "the certainty of being caught is a vastly more powerful deterrent than the punishment."  U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things about Deterrence*, May

2016.[15]  Not surprisingly, research has found evidence that prison can exacerbate, not reduce,

recidivism:

> "… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement.  We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Id*. at 2.

Indeed, the mere threat of *any prison* sentence for *a first-time* criminal offender, as is the

case with Mr. Keller, is a significant punishment.  The years already spent on pre-trial probation,

the loss of his children, the public shame of being involved in such a sorted affair, his continued

cooperation with government investigators, along with his lifetime classification as a felon, is

sufficient but not greater than necessary to both deter Mr. Keller from further criminal conduct

and work as a general deterrent to the public at large.  *See* 18 U.S.C. § 3553(a)(2)(B) and (C);

*United States v. Russell,* 600 F.3d 631, 637 (D.C. Cir. 2010) ("Subsections 3553(a)(2)(B) and (C)

codify the penal goals of general and specific deterrence, requiring disincentives to match the

severity of punishment to the harmfulness of the crime.")

### d.  *The Need to Avoid Unnecessary Sentencing Disparities*

As part of the Court's calculus in arriving at an appropriate sentence, avoiding

unwarranted sentence disparities among similarly situated defendants is an important and

statutorily mandated factor that any sentencing court must consider in arriving at its ultimate

sentencing decision.  *See* 18 U.S.C. § 3553(a)(6).  Considering the sentences received by other

§1512(c) defendants, as well as other January 6 defendants, a probationary sentence is sufficient

but not greater than necessary to achieve the goals of sentencing in Mr. Keller's case.

---

[15] Available at: https://www.ojp.gov/pdffiles1/nij/247350.pdf.

Since the start of the January 6 prosecutions, roughly eighty-eight defendants have been sentenced for violating 18 U.S.C. § 1512(c)(2).  However, most of these defendants also had companion charges—including such offenses as assault on law enforcement officers and destruction of property.  As of October 25, 2023, there have only been fourteen defendants with standalone §1512(c)(2) convictions.[16]  *See* **Exhibit 5 (Defendant's Comparative Sentencing Tables)**.  Though Mr. Keller's sentencing recommendation might, at first blush, seem at odds with other sentences imposed in §1512(c)(2) cases, in examining the sentences and conduct of three such defendants—those convicted of a standalone §1512(c)(2) offense—it is clear that Mr. Keller's' sentencing recommendation is more than reasonable.

In *United States v. Chansley*, 1:21-cr-003, the Court sentenced the defendant to 41 months of incarceration, followed by 36 months supervised release, and ordered the defendant to pay $2,000 restitution.  The defendant, also known as the "QAnon Shaman," engaged in the following conduct:

- On January 6, 2021, dressed in a horned Viking hat, shirtless, and adorned in war paint, the defendant approached the Capitol building and climbed a media tower that had been erected for the inauguration.  The defendant and others, pushed past the police line at the top of the Upper West Terrace of the Capitol and entered the building at roughly 2:00 p.m.

- Indeed, the defendant was with the mob that approached the first floor of the Capitol building on the Senate side.  Members of this crown broke two windows and broke open the doors to the Capitol building—the defendant then entered through the broken doors at 2:14 p.m.

- At 2:16 p.m., the defendant, along with others, ascended the stairs to the second floor to the Senate side of the building, where he was met by a line of U.S. Capitol Police officers.  The defendant challenged the officers to let the crowd pass—using a bullhorn to provoke the crowd and demand that the lawmakers inside be brought out.

---

[16] Information obtained from the government's sentencing table filed available at: https://www.justice.gov/usao-dc/capitol-breach-cases (last visited 10/25/2023).

- At approximately 2:52 p.m., the defendant broke into the Gallery of the Senate chamber alone, wherein he screamed obscenities—provoking the flood of rioters into the Chamber below.

- Defendant then scaled the Senate dais, taking the seat Vice President Pence had occupied less than an hour before.  Once at the dais, the defendant took pictures of himself occupying the seat, refused lawful orders to vacate, and beckoned other rioters up to the dais—leading them in an chant over the bullhorn he had brought into the chamber.

- In the days following the riots, the defendant gave multiple interviews with media outlets, calling the lawmakers who had taken shelter inside the Capitol during the siege "traitors" and considered the entire January 6 riot a "win"

*Id.*, Dkt. 70, pp 3-6 (Statement of Offense).

In *United States v. Pruitt*, 1:21-cr-023, the Court sentenced the defendant to 55 months in prison, three years of supervised release, and $2,000 restitution.  The defendant engaged in the following conduct:

- On the morning of January 6, 2021, the defendant posed for pictures holding what appeared to be a rifle—posting the same on social media.  In fact, in response to a text message from another individual stating: "I hope Trump declares war. It doesn't look good for the Republic…" the defendant responded by sending a photograph of himself holding a rifle.

- At 2:10 p.m. on January 6, 2021, the defendant was on the Northwest Lawn of the Capitol, wearing a tactical glove with knuckle pads.  By 2:14 p.m., the defendant was inside the capitol building, outside the Old Supreme Court—while there, he picked up a wooden sign and threw it violently.

- At some point, the defendant entered the Crypt, where he and other rioters overwhelmed a line of police and pursued them in their retreat.  While pursuing the officers, the defendant picked up a chair and threw it at the retreating police officers.  During the defendant's time inside the capitol, he also came into contact with Senator Schumer's security detail.

- Later, the defendant would describe his time clashing with police as "fun" and bragged of his exploits on national news.

*Id.*, Dkt. 61, pp 3-6 (Statement of Offense).  Importantly, the defendant in *Pruitt* had a criminal history and participated in the aforementioned events while on pretrial release.

In *United States v. Michetti*, 1:21-cr-232, the Court sentenced the defendant to 9 months of incarceration (despite the government's request for 18 months of incarceration), 24 months of supervised release, and ordered the defendant to pay $2,000 in restitution.  There, the defendant engaged in the following conduct:

- On January 6, 2021, at approximately 2:06 p.m., after attending the president's "Stop the Steal" rally, the defendant walked to the Capitol building while texting another individual "...it's going down here we stormed the building they held us back with spray and teargas and paintballs."

- The defendant entered the Upper West Terrace Door with other rioters at approximately 2:35 p.m., minutes after the door was initially breached.  At approximately 2:44 p.m., on January 6, 2021, the defendant sent two videos to another individual from his telephone, showing rioters inside the U.S. Capitol Building.

- Defendant was then in a crowd of people at about 2:44 p.m. trying to get past a police line of Metropolitan Police Officers in the hallway by the Old Senate Chamber.  He remained near the front of the crowd, yelling at the police "we feed your family"; "you are just taking orders"; and "we pay you".  He gesticulated at the officers and at one point briefly pinched the sleeve of one officer as the officers were trying to do their lawful duty and keep the mob from penetrating further into the building.

- The defendant then went into the inner entry area by East Rotunda doors, where he faced a U.S. Capitol Police bicycle officer and yelled and gesticulated toward the officer. He continued inside to the inner door to the Rotunda at about 3:12 p.m., again pushing with the mob against a police line there.

- [Afterwards] [defendant] sent a series of text messages to W1, which reads as follows: "I understand your point but what I'm saying is [W1's name] the election was rigged and everyone knows it. All's we wanted was an investigation that's it. And they couldn't investigate the biggest presidential race in history with mail in ballots who everyone knows is easy to fraud"; "This is tyranny they say there and told us 'we rigged the election and there's nuthin you can do about it' what do you think should be done?"

*Id.*, Dkt. 41, pp. 3-5 (Statement of Offense).   Notably, the defendant in *Michetti* remained on the Capitol grounds for approximately *two hours* after departing from the Capitol building, leaving the grounds at approximately 5:26 p.m.

The distinctions between Mr. Keller's conduct here and those defendants detailed above are glaringly obvious. Unlike the "QAnon Shaman," Mr. Keller did not lead a group of rioters onto the Senate floor and scale the walls of the chamber, nor did he demand that the lawmakers and staff inside the Capitol be brought outside by the mob. Nor did Mr. Keller do media interviews after the fact justifying and bragging about his behavior like defendants Chansley and Pruitt. Moreover, unlike defendant Pruitt, Mr. Keller did not use a weapon (or a threat of a weapon) in connection to his offense, nor did he, like the defendants in *Michetti* and *Chansley,* brag about his exploits to others or lead others in clashes with police while at the Capitol.

Likewise, examining the conduct of other January 6 defendants who received sentences other than active incarceration and arguably engaged in far more offensive and serious conduct than that at issue here adds support for Mr. Keller's sentencing request.[17] Indeed, unlike the other January 6 defendants detailed below, Mr. Keller did not engage violently with the police, use weapons, hurl objects through windows, or deface property. To be clear, Mr. Keller's conduct on January 6 was unlawful, indefensible, and unjustified; but the conduct he exhibited was markedly different from defendants *Blauser*, *Gonzalez*, *Carico,* and *Rodean*—whose cases are briefly summarized below.

In *United States v. Blauser*, 1:21-CR-00386, the Court neither sentenced the defendant to incarceration or probation (despite the government's request for 3 months of home detention). There, the defendant engaged in the following conduct:

> "(1) Blauser pushed his way through the East Rotunda door and (2) he is captured on CCTV having some physical contact with law-enforcement as they were trying to get

---

[17] In the interests of brevity, Counsel has only selected four cases from Exhibit 5, Table 2. However, even a cursory review of all fourteen cases detailed in Table 2 clearly shows that the conduct exhibited by those defendants was arguably more much more severe (or at least the same) as the conduct underlying Mr. Keller's conviction—and all the defendant's listed in Exhibit 5, Table 2 received a sentence other than active incarceration.

> people to exit the Capitol Building.  He lowered his shoulder [] and pushed into law-enforcement to apparently get access to co-defendant Bauer and extricate her...At one point in the Rotunda, Pauline Bauer can be seen and heard confronting law-enforcement and screaming "bring them out . . . they need to hang." ...When law-enforcement tries to get Bauer to back up, she says "Fuck you, you back up" and pushes law-enforcement."

*See* Dkt. 98, pp. 1-4 (Govt Sentencing Memo).  *See also* Dkt. 77 (Statement of Offense) ("[]

Blauser and [co-defendant] [were] involved in a brief skirmish with law enforcement as they

resist law enforcement as law enforcement is pushing them out of the Rotunda.").  Blauser and

his co-defendant were in the Capitol for roughly thirty-eight minutes.  *Id*.

Here, Mr. Keller did not engage in any "skirmishes" with law enforcement; in fact, Mr.

Keller did not engage in *any* aggressive contact with any police officers—his only conduct being

a passive shake of his arm to remove an officer's hand who was pushing the crowd toward the

exit.  More importantly, unlike Blauser's co-defendant, Mr. Keller did not threaten to kill anyone

by threatening to "hang" them.

In *United States v. Gonzalez*, 1:21-CR-00115, the Court sentenced the defendant to 24

months of probation (despite the government's request for three months of incarceration).  There,

the defendant engaged in the following conduct:

> "Gonzalez (1) was among the first wave of rioters to enter the U.S. Capitol despite seeing violence between rioters and officers; (2) made numerous recordings from the riot and the Capitol; (3) illegally smoked and distributed marijuana to others in the Capitol; (4) only left the Capitol when forced to do so by law enforcement; (5) livestreamed a review of his footage from the January 6 attack on the Capitol in the days following the riot, including noting that he and others were looking for doors to break in; (6) hid from law enforcement after the January 6 attack; and (7) publicly and repeatedly communicated a lack of remorse in his own livestreams, on multiple public platforms, and in an interview aired as part of an HBO documentary—including blaming "infiltration" by "Antifa" and the "FBI."";
> "Gonzalez exited the Rotunda into the East Rotunda Door interior, close to an exit to the Capitol. Rather than exit the building as so many law enforcement officers ordered, Gonzalez attempted to turn back and return to the Rotunda."

*See* Dkt. 41, pp. 4-5 (Govt Sentencing Memo).  Gonzalez was inside the Capitol for roughly

thirty-seven minutes.  Dkt. 29, pp. 3-4 (Statement of Offense).

Here, unlike Gonzalez, Mr. Keller did not attempt to blame the FBI or "Antifa" for his conduct, but instead, has repeatedly expressed his deep-hearted remorse for his actions that day—along with cooperating with the government whenever his assistance was requested. Moreover, once Mr. Keller left the Capitol building that day, unlike Gonzalez, he never attempted to re-enter.  Mr. Keller, also unlike Gonzalez, did not use or distribute illegal drugs while at the Capitol on January 6.

In *United States v. Carico*, 1:21-CR-00696, the Court sentenced the defendant to 60 days home detention (despite the government's request for 30 days of incarceration).  There, the defendant engaged in the following conduct:

> "Carico: (1) entered the Capitol through the Senate Wing Doors about nine minutes after they were breached; (2) spent about 52 minutes in the Capitol and called for a "second wave" of rioters; (3) left the Capitol only after police officers started clearing the Rotunda; (4) walked around the Capitol building, climbed the media tower near the Inauguration platform, and filmed violence against police officers taking place on the Lower West Terrace; (5) referred to the police officers being attacked as "fucking traitors" and yelled that the Speaker of the House of Representatives should "go fuck [her]self"; (6) subsequently deleted many of the photos and videos he took on January 6; (7) repeatedly denied having done anything wrong, claimed that the day "was peaceful" despite witnessing violence, and said "I'm a Patriot and screw anyone that thinks different"; and (8) expressed remorse only in anticipation of this sentencing, but still made inaccurate statements to the Probation Officer about his marijuana use."

*See* Dkt. 33. pp. 1-2 (Govt Sentencing Memo).  Carico was inside the Capitol for roughly fifty-two minutes.  Dkt. 28, pp 4-5 (Statement of Offense).

Mr. Keller never used illegal drugs during his stay at the Capitol, nor did he attempt to call for a "second wave" of rioters, like defendant Carico.  Moreover, Mr. Keller never climbed the media tower near the Inauguration platform, nor did he attempt to deny that his behavior was wrong or illegal—such as Carico.  However, despite these differences, both Keller and Carico spent roughly the same amount of time inside the Capitol building.

Finally, and perhaps most illuminating, is the case of *United States v. Rodean*, 1:21-CR-057, where the Court sentenced the defendant to 5 years of probation (despite the government's request for 57 months of incarceration).  There, the defendant engaged in the following conduct:

> "Rodean smashed two windowpanes of the U.S. Capitol building with a flagpole and a metal object during the January 6, 2021 attack.  To get to the building, he, together with other rioters, pushed through or past snow fencing, makeshift bike rack barriers, scaffolding, and even a police line on the west side of the building.  Once inside, he and other rioters (some of whom were yelling "where are they counting the votes?") pursued U.S. Capitol Police Officer Eugene Goodman up the stairs to the hallway outside of the Senate chamber.  Outside of the Senate chamber, Rodean engaged in a stand-off with a line of police officers who warned rioters to stay back and to leave.  Instead of leaving, Rodean remained in the hallway for over forty minutes, at one point, displaying a hatchet to an officer, and at another point, posing for a photo while waving his "Trump is my President" flag.  The next day, he told a supervisor at his job that he "did what needed to be done.""

*See* Dkt. 67, pp. 1-2 (Govt Sentencing Memo).  Rodean was inside the Capitol for approximately forty-two minutes.  *Id*. at 11, 14

The distinctions between Mr. Keller and Roden are vast.  Mr. Keller did not deface or destroy any property while at the Capitol, nor did he personally push through a police line, chase police officers, or engage in a stand-off with police.  Most importantly, however, and unlike Rodean, Mr. Keller did not use a hatchet (or any weapon) during his underlying offense.  Despite these differences, both Keller and Roden spent roughly the same amount of time inside the Capitol building.

 Though Mr. Keller did not spend an insignificant amount of time inside the Capitol, he is hardly alone in this respect.  Indeed, as sampled below, many of the January 6 defendants who received sentences other than incarceration spent roughly the same or more time within the Capitol building:

- *United States v. Stotts*, 1:21-cr-272—Sentenced to 60 days home detention; 24 months of probation after spending *one hour* inside the Capitol, scaled the walls on the Upper West Terrace to gain access to the building, and made post-riot statements

on social media boasting about his recent exploits and threatening that he would "be back".

- *United States v. Cunningham*, 1:21-cr-603—Sentenced to 12 months of probation, including 3 months of home detention, after spending *an hour and a half* inside the Capitol, including entering the Office of the Speaker of the House.

- *United States v. Wood*, 1:21-cr-223—Sentenced to 3 years of probation, including 12 months of home detention, after spending *eighty minutes* inside the Capitol and scaling the media tower, encouraged others to move forward into the building, chased police officers, physically pushed against police officers, and went through the Offices of the Speaker of the House.

- *United States v. Gordon*, 1:21-cr-099—Sentenced to 36 Months of Probation, including 90 days of home detention, after spending *one hour* inside the Capitol. Gordon also made statements prior to January 6 that he welcomed violence at the Capitol and, once there, was part of a crowd that pushed its way past a line of police officers.  In the days that followed, Gordon made statements bragging about his participation in the riots and never expressed remorse for his behavior.

Again, although Mr. Keller's conduct at the Capitol was inexcusable, his behavior was non-violent—and arguably far less disruptive than many of the defendants detailed above.  To avoid unwarranted disparities, this Court should not lump Mr. Keller's conduct in with some of the more serious offenders but instead should consider Mr. Keller's relatively minor role, the fact that he has already pleaded guilty to a felony, recognize that he has already spent years on pre-trial release and has cooperated fully in the government's investigation.  Considering the above, Mr. Keller humbly asks that this Court impose a variant probation sentence.

## <u>CONCLUSION</u>

As such, for the aforementioned reasons, Mr. Keller respectfully requests that this Court impose a probationary sentence accompanied by a reasonable restitution order.  Should this Court nevertheless impose a period of active incarceration, Mr. Keller respectfully requests a judicial recommendation to a facility near Colorado Springs, Colorado, where he can take classes under the First Step Act and be near his wife and family.

A probationary sentence would protect the community, promote respect for the law, and deter future crime by imposing consequences for Mr. Keller's behavior while recognizing his acceptance of responsibility, the punishment he has already suffered, and his role in the offense. It would also achieve a degree of uniformity in the sentences imposed.

Respectfully submitted,

KLETE D. KELLER,
By Counsel

_____/s/_____
Zachary A. Deubler, Esq. (D.C. Bar # 25432)
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st Floor
Alexandria, VA 22314
(703) 684-7908 (T)
(703) 649-6360 (F)
zach@carmichaellegal.com
*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 17th day of November 2023, a true and accurate of the foregoing was served on all counsel of record via the Court's Electronic Filing System.  I further certify that a copy was also sent by e-mail to Crystal Lustig, Probation Officer, at Crystal_Lustig@dcp.uscourts.gov.

_____/s/_____
Zachary A. Deubler, Esq.